1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE WESTERN DISTRICT OF TEXAS
2                               WACO DIVISION

3    JENAM TECH, LLC                  *  April 27, 2021
                                      *
4    VS.                              *  CIVIL ACTION NO. W-20-CV-453
                                      *
5    GOOGLE LLC                       *

6              BEFORE THE HONORABLE ALAN D ALBRIGHT
                     MOTION HEARING (via Zoom)
7
     APPEARANCES:
8
     For the Plaintiff:         Derek F. Dahlgren, Esq.
9                               Nadiia Loizides, Esq.
                                Devlin Law Firm LLC
10                              1526 Gilpin Avenue
                                Wilmington, DE 19806
11
     For the Defendant:         Matthew M. Werdegar, Esq.
12                              Rylee Kercher Olm, Esq.
                                Keker, Van Nest & Peters LLP
13                              633 Battery Street
                                San Francisco, CA 94111-1809
14
                                Michael E. Jones, Esq.
15                              Potter Minton PC
                                110 N College, Suite 500
16                              Tyler, TX 75702

17   Court Reporter:            Kristie M. Davis, CRR, RMR
                                PO Box 20994
18                              Waco, Texas 76702-0994
                                (254) 340-6114
19

20        Proceedings recorded by mechanical stenography, transcript

21   produced by computer-aided transcription.

22

23

24

25

09:31    1          (April 27, 2021, 9:31 a.m.)

09:31    2          THE COURT:  Good morning, everyone.

09:31    3          DEPUTY CLERK:  Motion hearing in Civil Action W-20-CV-453,

09:31    4    styled Jenam Tech LLC versus Google LLC.

09:31    5          THE COURT:  I think I heard Suzanne announce the case, but

09:32    6    I'm not sure.

09:32    7          If I could hear announcements from counsel for plaintiff

09:32    8    and then counsel for defendants.  Whoever's going to be

09:32    9    speaking would be most helpful so I know -- I can write down

09:32   10    and know who's going to be chatting.

09:32   11          MR. DAHLGREN:  Good morning, Your Honor.  My name is Derek

09:32   12    Dahlgren from the Devlin Law Firm.  I'll be speaking on behalf

09:32   13    of plaintiff.

09:32   14          THE COURT:  Mr. Dahlgren, welcome back.

09:32   15          MR. DAHLGREN:  Thank you.

09:32   16          THE COURT:  I always enjoy hearing from you.

09:32   17          MR. JONES:  Good morning, Your Honor.  This is Mike Jones

09:32   18    representing Google.  Appearing for Google at this hearing will

09:32   19    be Mr. Matthew Werdegar and Ms. Rylee Kercher Olm, and Ms. Olm

09:32   20    will be providing the argument for Google.  Thank you, Your

09:32   21    Honor.

09:32   22          THE COURT:  Welcome, everyone.  Happy to hear the argument

09:32   23    this morning.

09:32   24          MS. OLM:  Thank you, Your Honor.  Should I go ahead and

09:32   25    proceed with the motion to transfer argument?

3

09:32  1    THE COURT:  One of you needs to.  So please.

09:33  2    MS. OLM:  Okay.  Rylee Kercher Olm on behalf of defendant

09:33  3  Google LLC.  Today I will be discussing Google's motion to

09:33  4  transfer this action to the Northern District of California.

09:33  5    This patent infringement dispute is about Google's QUIC

09:33  6  protocol, an internet protocol that was designed and developed

09:33  7  largely in Google's headquarters in the Northern District of

09:33  8  California.  Because Jenam does not dispute that this case

09:33  9  could have been brought in the Northern District of California,

09:33  10  the question for this Court is whether the Northern District of

09:33  11  California is clearly a more convenient venue than the Western

09:33  12  District of Texas based on the four private and four public

09:33  13  interest factors.

09:33  14    Your Honor, in this case there are five factors that weigh

09:33  15  in favor of transfer, and the remaining three are neutral.

09:33  16  There are no factors that weigh against transfer, because the

09:33  17  parties in this case have no relevant connection to the Western

09:33  18  District of Texas.

09:33  19    I'd like to briefly discuss each factor, starting with the

09:33  20  four private interest factors, if that's all right with Your

09:34  21  Honor.

09:34  22    THE COURT:  Yes, ma'am.  Of course.

09:34  23    MS. OLM:  Thank you.

09:34  24    So I'd like to start by going over the factors related to

09:34  25  party and third-party witnesses, since the convenience of the

09:34  1   witness is the most important part of the transfer analysis.

09:34  2        So beginning with the availability of the compulsory

09:34  3   process to ensure the attendance of witnesses, Google has

09:34  4   identified four nonparty witnesses with relevant knowledge who

09:34  5   reside in Northern California and for whom there's no

09:34  6   indication that these witnesses would be willing to testify in

09:34  7   the Western District of Texas.  Jenam has also indicated that

09:34  8   all four of these individuals have relevant testimony.

09:34  9        First, there's Jana Iyengar, the co-editor of the Internet

09:34  10  Engineering Task Force's version of the QUIC protocol.  Now,

09:34  11  Jenam cites to 27 different versions of IETF's QUIC in its

09:34  12  infringement contentions, and Dr. Iyengar is a co-editor on

09:34  13  every single version.  And Dr. Iyengar lives in Northern

09:35  14  California and has declared that he's likely unwilling to

09:35  15  testify in the Western District of Texas.

09:35  16       Second, there's Ryan Hamilton who's a co-author of the

09:35  17  IETF's initial specification for QUIC who also resides in

09:35  18  Northern California.  Now, Mr. Hamilton was also a technical

09:35  19  lead on Google's QUIC team.  And he was on Google's QUIC team

09:35  20  for ten years and assisted with the deploying QUIC in Chrome,

09:35  21  Google server and other Google products, so he's likely to have

09:35  22  relevant testimony.

09:35  23       Third and fourth are Jim Roskind and Charles Krasic who

09:35  24  are two former Google employees who helped develop the Google

09:35  25  QUIC protocol in its earliest stages, and they now reside in

09:35  1   Northern California as well.

09:35  2       And these engineers are going to be of particular

09:35  3   importance in this case because the timing of Google's

09:35  4   development of the QUIC protocol is at issue, because we're

09:35  5   contesting Jenam's asserted priority date.

09:35  6       And Jenam has also alleged that the earliest version of

09:36  7   QUIC contained the infringing functionalities.  And since these

09:36  8   individuals worked on QUIC at that time, Jenam concedes they

09:36  9   have relevant testimony.

09:36  10      Now, to be clear, Your Honor, these aren't random

09:36  11  cherry-picked witnesses.  These are early developers who had

09:36  12  lead roles in QUIC's development and whose work Jenam itself

09:36  13  relies on in its infringement contentions.  And Google would be

09:36  14  prejudiced if these witnesses could not testify live.

09:36  15      Now, while there are four nonparty witnesses in the

09:36  16  Northern District of California who are likely unwilling to

09:36  17  testify, there are no third-party witnesses with relevant

09:36  18  knowledge known to be within the Western District of Texas.

09:36  19      As this Court and the Federal Circuit have repeatedly

09:36  20  held, this factor weighs heavily in favor of transfer where

09:36  21  more third-party witnesses reside within the transferee venue

09:36  22  than within the transferor venue.

09:36  23      Now, Jenam does allege that there's a single nonparty

09:36  24  witness within the State of Texas though outside the Western

09:36  25  District of Texas.  And that person is Patrick Caldwell who

6

09:37  1   prosecuted the patents-in-suit.  But Jenam does not claim that

09:37  2   he's unwilling to testify in the Northern District of

09:37  3   California, nor could Jenam so reasonably claim.

09:37  4        As Jenam's long-time patent counsel who's been involved in

09:37  5   this litigation as well, Mr. Caldwell is not an unwilling

09:37  6   witness and thus he has no impact on this factor.  Further, the

09:37  7   other attorney who assisted with prosecuting the

09:37  8   patents-in-suit, Kevin Zilka, he resides in Northern

09:37  9   California.  So in sum, this factor weighs heavily in favor of

09:37  10  transfer.

09:37  11       Turning to the second factor, the cost of attendance for

09:37  12  willing witnesses.  Now, in addition to the nonparty witnesses

09:37  13  in Northern California who we just discussed, Google has

09:37  14  identified several current employees in Northern California

09:37  15  with relevant testimony.  Notably in June 2020, the operative

09:37  16  point in time, half of the engineers on Google's QUIC team were

09:38  17  located in the Northern District of California.

09:38  18       Although some of those team members were recently

09:38  19  reassigned to other teams, these engineers who were working on

09:38  20  QUIC for years still have relevant knowledge about the

09:38  21  deployment and functionality of Google's QUIC protocol, and

09:38  22  they're still located in Northern California.  In fact, about

09:38  23  40 percent of current Google employees that are or were

09:38  24  recently on Google's QUIC team are in the Northern District of

09:38  25  California.

09:38  1        For instance, Google's technical lead for the QUIC

09:38  2   protocol is located in Northern California, and he also works

09:38  3   with the Internet Engineering Task Force on developing a

09:38  4   standardized version of QUIC.  And he's responsible for

09:38  5   maintaining the materials at chromium.org/quic which is a

09:38  6   website that Jenam relies on in its infringement contentions.

09:38  7        There is also a senior person associated with Jenam who's

09:38  8   located in Northern California and who was involved in the

09:38  9   prosecution of the patents-in-suit, drafting of infringement

09:39  10  notices and licensing of the patents.

09:39  11       Jenam cannot identify any relevant witnesses in the

09:39  12  Western District of Texas, so Jenam resorts in its briefing to

09:39  13  identifying witnesses outside of the Western District of Texas,

09:39  14  ignoring that pursuant to the case law it is improper to

09:39  15  consider Texas' central location in the absence of witnesses

09:39  16  within plaintiff's preferred venue.

09:39  17       Jenam also misconstrues the 100-mile rule.  For instance,

09:39  18  the inventor of the patents-in-suit, Robert Morris, is located

09:39  19  in Georgia, 900 miles from the Western District of Texas.  And

09:39  20  thus he's going to have to travel a significant distance no

09:39  21  matter where he testifies.

09:39  22       Also, more importantly, Mr. Morris has indicated that he

09:39  23  would prefer to testify remotely regardless, and that he would

09:39  24  most likely be unwilling to testify live in either forum.  So

09:39  25  he is not a willing witness and his location does not impact

09:39 1    this factor.  Thus, this factor heavily favors transfer.

09:40 2        Turning to the third private interest factor, the relative

09:40 3    ease of access to sources of proof.  Google will have the bulk

09:40 4    of relevant documents, and the source code and technical

09:40 5    documents related to Google's QUIC protocol are created and

09:40 6    maintained in Northern California and Massachusetts.  This

09:40 7    includes Google's QUIC team employees' local copies of

09:40 8    electronic documents and hard-copy documents.  And QUIC

09:40 9    documents stored electronically will also be more readily

09:40 10   accessible from the Northern District of California.

09:40 11       There are also several third parties who are located in

09:40 12   Northern California that are likely to have relevant evidence

09:40 13   stored there.  For instance, the senior person associated with

09:40 14   Jenam, who we just discussed, he's located in Northern

09:40 15   California.  He was involved in the prosecution of the

09:40 16   patents-in-suit, the drafting of infringement notices related

09:40 17   to the patents-in-suit and the licensing of the patents.

09:41 18       And the company that Jenam licensed its patents to and

09:41 19   authorized the grant of sublicenses to is located in Northern

09:41 20   California.  And we believe that they will have evidence

09:41 21   relevant to liability and damages.

09:41 22       In addition, Google plans to subpoena Cisco Systems

09:41 23   because it has prior system art that we contend invalidates

09:41 24   Jenam's patents.  And Cisco is also headquartered in Northern

09:41 25   California.

09:41  1      Conversely, there are no Google QUIC documents that are

09:41  2  created, maintained or stored electronically in the Western

09:41  3  District of Texas, as there are no data centers in the Western

09:41  4  District of Texas, nor are there any Google employees working

09:41  5  on QUIC in Texas.

09:41  6      Jenam has not alleged that it or any third parties possess

09:41  7  any evidence in the Western District of Texas.  So under the

09:41  8  relevant case law, this factor necessarily weighs heavily in

09:41  9  favor of transfer.

09:41  10      Turning to the fourth private interest factor, all other

09:42  11  practical problems.  This factor is neutral where, as is the

09:42  12  case here, the suit is in its earliest stages.  All that has

09:42  13  occurred in this case is the service of infringement

09:42  14  contentions, no discovery has occurred, other than venue

09:42  15  discovery, and no case schedule has been entered.

09:42  16      This is only the second time that counsel has appeared

09:42  17  before your Court, and the Court has not had to engage in any

09:42  18  substantive analysis of the case to date.  So matters of

09:42  19  judicial economy are not a concern.  And whatever has been done

09:42  20  on the infringement contention front will of course carry over

09:42  21  to the transferee Court, so there's no prejudice to Jenam.

09:42  22      I'd like to turn to the public interest factors now,

09:42  23  unless Your Honor has any questions at this time.

09:42  24      Okay.  So the first public interest factor I'd like to

09:42  25  discuss is Court congestion.  The Federal Circuit has recently

09:42  1  held in In Re Adobe that there is not an appreciable difference

09:42  2  in court congestion between the Northern District of California

09:42  3  and the Western District of Texas.

09:43  4      Jenam does not claim that any of these statistics have

09:43  5  changed since the Federal Circuit's decision.  And as Google

09:43  6  lays out in its briefing, the two forums have a similar number

09:43  7  of pending cases, similar number of pending patent cases and

09:43  8  similar meeting time to trial in civil cases generally, as well

09:43  9  as patent cases specifically.  Your Honor, this continues to be

09:43  10  true.

09:43  11      And, in fact, the Northern District of California is open

09:43  12  and holding in-person jury trials despite the COVID-19

09:43  13  pandemic.  For instance, Judge Freeman is currently conducting

09:43  14  an in-person jury trial in the San Jose Courthouse that my firm

09:43  15  happens to be involved in.  And if you go to the Court's

09:43  16  website, you'll see her calendar has a jury schedule trial --

09:43  17  jury trial scheduled --

09:43  18      THE COURT:  I know Judge Freeman well.  I can't think of

09:43  19  anyone I would rather be compared to than Judge Freeman, though

09:43  20  I don't think she relishes that comparison.  But it seems to me

09:43  21  that the point you're making here is actually -- my sense of

09:43  22  it -- correct me if I'm wrong.  My sense of it is that she's

09:44  23  sort of an outlier in her district in terms of having trials.

09:44  24  It's not that everyone in the Northern District -- or any of

09:44  25  the California districts are opening up, rather, it's that

09:44 1    Judge Freeman is a bit of a trailblazer, which doesn't surprise

09:44 2    me, by being willing to have a trial.  That's my sense out here

09:44 3    in Texas.

09:44 4         MS. OLM:  Actually, Your Honor, the other two courthouses

09:44 5    are both open for jury trials as well.  There's one that's

09:44 6    beginning in the Oakland courthouse today before Judge White,

09:44 7    and Judge Alsop has a jury trial scheduled for the beginning of

09:44 8    next week in the San Francisco courthouse.

09:44 9         So we are -- we're back up and running, mostly vaccinated,

09:44 10   everyone's ready to get going.

09:44 11        THE COURT:  That's good intel.  I appreciate it.

09:44 12        MS. OLM:  Yes, Your Honor.

09:44 13        Turning to the second public interest factor, the local

09:44 14   interest and having localized interest decided at home.

09:45 15   Google's work and reputation has been called into question.

09:45 16   And many of the Google employees who created and managed

09:45 17   Google's implementation of the QUIC protocol are in the

09:45 18   Northern District of California.  None are in the Western

09:45 19   District of Texas.

09:45 20        Although Google does have some employees in the Western

09:45 21   District of Texas, its employees in Austin comprise less than

09:45 22   2 percent of Google's United States workforce.  And more

09:45 23   importantly, there's no relevant factual connection between the

09:45 24   events and the Western District of Texas as required by the

09:45 25   case law for a local interest to exist.

09:45  1        And in addition to the current and former Google employees

09:45  2  who are located in Northern California, there's also

09:45  3  Dr. Iyengar we discussed previously who's the co-editor of the

09:45  4  Internet Engineering Task Force's version of the QUIC protocol.

09:45  5  And Jenam is also alleging that the IETF's QUIC protocol

09:45  6  infringes its patents.

09:45  7        Further, Jenam's connection to the Western District of

09:45  8  Texas is nonexistent.  It has no offices, no employees and no

09:46  9  witnesses located here.  And the patent -- inventor of the

09:46  10  patents-in-suit also has no ties to Texas.  Therefore, this

09:46  11  factor weighs in favor of transfer.

09:46  12        Your Honor, in sum, with five factors substantially

09:46  13  favoring transfer, three factors being neutral and nothing on

09:46  14  the other side of the ledger supporting keeping these cases in

09:46  15  the Western District of Texas, the Northern District of

09:46  16  California is clearly a more convenient venue, and existing

09:46  17  precedent supports this case being transferred.

09:46  18        At this point, Your Honor, I'm happy to address any

09:46  19  specific questions Your Honor has.

09:46  20        THE COURT:  I think I followed your argument.

09:46  21        I'll hear from counsel for plaintiff.

09:46  22        MR. DAHLGREN:  Good morning, Your Honor.

09:46  23        I would like to start, I guess, addressing a few points

09:46  24  that were raised by Ms. Olm.  And I guess -- the question was

09:47  25  about QUIC that -- sorry.  Let me switch gears.

09:47  1         So the first thing I want to talk about is the ease of

09:47  2  access to sources of proof.  The precedent states that it's the

09:47  3  location even with electronic documents, which I think -- you

09:47  4  know, the majority of people may think is outdated, but it's

09:47  5  still the law at this point.

09:47  6         And Google has never said that they have their electronic

09:47  7  documents that their distributed teams use and collaborate

09:47  8  with, that they're stored in the Northern District of

09:47  9  California.  They only raised these local copies and hard

09:47  10  copies in the reply.  And our opinion is that those might be

09:47  11  outdated, it might be incorrect.

09:47  12         THE COURT:  Mr Dahlgren, I'll tell you, I've done a lot of

09:48  13  these.  I'm not very persuaded by that aspect of -- there are

09:48  14  several things Ms. Olm said I thought were very compelling.

09:48  15  The location of documents in 2021 is not one I'm overly

09:48  16  concerned about.

09:48  17         What I -- if I were you, what I'd really focus on was

09:48  18  that -- the number of people who are in the Northern District

09:48  19  of California.  That's one big issue.  And the second would be

09:48  20  any ties this case has to our district.

09:48  21         MR. DAHLGREN:  Sure.  Thank you, Your Honor.  I appreciate

09:48  22  that guidance.

09:48  23         With respect to the availability of compulsory process,

09:48  24  Google has not shown that its five alleged third-party

09:48  25  witnesses are unwilling to testify in the Western District of

09:48  1    Texas.  For one, Dr. Iyengar that was mentioned before, his

09:48  2    declaration only states that he is likely unwilling to testify.

09:49  3    And speculative statements like that can be -- or are

09:49  4    considered insufficient.

09:49  5        Google identified a number of prior art's witnesses

09:49  6    related to some Cisco products, and they relied on the fact

09:49  7    that Cisco was headquartered in the Northern District of

09:49  8    California.  But Cisco also has an office in Austin, and we

09:49  9    identified a number of individuals that apparently had

09:49  10   equivalent knowledge regarding the alleged prior art.

09:49  11       Another issue we had is Google never specified which

09:49  12   witnesses are most knowledgeable and what they possessed --

09:49  13   these third-party witnesses possess that current employees

09:49  14   don't.  We identified Mr. Ian Swett and Ms. Alyssa Wilk.  They

09:49  15   have both worked on QUIC for at least a decade.  I think Alyssa

09:50  16   Wilk was -- back in 2008 she started at Google.  So they were

09:50  17   involved in the beginning.

09:50  18       And the individual -- I believe its -- it sounds like its

09:50  19   sole individual that's employed by Google now in the Northern

09:50  20   District of California, the technical lead and liaison with the

09:50  21   IETF, he has only been with Google for a couple years.  And so

09:50  22   it's our opinion that he is less likely to have, you know,

09:50  23   relevant knowledge.

09:50  24       And there's also numerous third parties that we've

09:50  25   identified in the Western District of Texas that would be

09:50   1   subject to the Court's subpoena power.  This includes Cisco,

09:50   2   Fastly, which -- that's where Dr. Iyengar currently works --

09:50   3   and Mozilla, Cloudfare and then a couple individuals.  Yixin

09:51   4   Wang was a former Google employee who worked on QUIC, and he's

09:51   5   in the Dallas area.  And then Hajime Fujita, who is a technical

09:51   6   person at Fastly that has worked with QUIC.

09:51   7       So there are a number of third parties in this district

09:51   8   that, if the case was transferred, you know, some would

09:51   9   potentially not be within subpoena power.

09:51   10      And there's also the issue of Mirai Ventures, LLC.  It is

09:51   11  a CUTMA account that was created.  It's managed by Patrick

09:51   12  Caldwell, the prosecuting attorney.  So he has dual roles in

09:51   13  this case.  We don't believe that the Mirai issues are

09:51   14  necessarily relevant, but Google has made a big point of

09:52   15  pursuing that.

09:52   16      With respect to willing witnesses, again, Google hasn't

09:52   17  shown that it would be unduly burdensome to testify to have a

09:52   18  trial in Waco.  And when Ms. Olm said that we don't have any

09:52   19  employees currently in the Western District of Texas, we

09:52   20  mention in our briefing that we were in a bit of a conundrum.

09:52   21  Google has essentially got a stamp of approval from the Federal

09:52   22  Circuit that they're not subject to venue in the Eastern

09:52   23  District of Texas, and that is our home forum.  And so we were

09:52   24  forced to make a choice of where to sue.

09:52   25      And for convenience and also your order regarding the

09:53  1   proceedings and you run cases efficiently, we chose the Western

09:53  2   District of Texas.  We have both Patrick Caldwell and then the

09:53  3   client, Mr. Gordon, who are located reasonably close to Waco.

09:53  4       Now, Mr. Morris, you know, who's in Georgia, he has

09:53  5   indicated that his preferred mode of transportation is driving.

09:53  6   I believe it's approximately 900 miles from Georgia to Waco,

09:53  7   and it's about 2600 miles to go to San Francisco.  And I think

09:53  8   that's a substantial difference.  And I understand that there's

09:53  9   case law stating that when people have to travel long

09:53  10  distances, it's kind of a wash, if you will, but I think that

09:53  11  this situation differs.

09:53  12      And again, transferring the case, it would be a burden on

09:54  13  Mr. Caldwell as well.  I think that trip is about 1700 miles,

09:54  14  interfere with his work.

09:54  15      And we have Mr. Zilka that was mentioned by Ms. Olm, who

09:54  16  has agreed to attend trial or testify at a hearing in Waco.

09:54  17  But I think that that kind of moots the concern, at least with

09:54  18  respect to that potential third-party witness.

09:54  19      And to clarify, he is not part of Jenam.  He's not

09:54  20  affiliated with Jenam.  Jenam retained him as an attorney in

09:54  21  2014, and he's still functioning in that role.  He does assist

09:54  22  with prosecution.  He reviewed some notice letters.  He did not

09:54  23  draft them, just to clarify that point.  And he's done other

09:54  24  kind of this legal counseling for Jenam on -- from time to

09:55  25  time.

17

09:55   1      But, you know, Google's argument that, you know, Oso-IP

09:55   2  and Kevin Zilka are secretly running Jenam in this litigation

09:55   3  are just not true.  But again, it's all a moot point because

09:55   4  he's agreed to come to Waco.

09:55   5      Now, the development of QUIC, Ms. Olm said that about -- I

09:55   6  believe, that 40 percent of the employees working on it are in

09:55   7  the Northern District of California.  The information that

09:55   8  we've provided that we've gleaned from the public records seems

09:55   9  to indicate that most of the work actually happened in

09:55   10  Cambridge, Massachusetts.  And now that there's only, I

09:55   11  believe, a single employee who is working out of Northern

09:55   12  District of California for Google on QUIC, those Massachusetts

09:55   13  employees seem irrelevant.

09:55   14      And that's also where Mr. Swett and Ms. Wilk are located.

09:56   15  And those are two individuals we identified that have

09:56   16  substantial experience over a long period of time, longer than

09:56   17  Dr. Iyengar or the other people that Google has identified,

09:56   18  like Jim Roskind and all those people.

09:56   19      So it's our opinion that they'd probably be more likely

09:56   20  witnesses.  And that's kind of an issue that we have here.

09:56   21  This is a situation where it's a great information disparity.

09:56   22  We have tried to get a brief summary of the individuals and

09:56   23  their roles with respect to QUIC and, you know, job

09:56   24  responsibilities, and Google has refused to provide that.

09:56   25      And so we're really left in the dark and just have to look

09:56  1   at public information to try to find out who the relevant

09:56  2   people are.  We have sought that discovery, and I'm happy to

09:57  3   talk about that in more detail.  But without this information,

09:57  4   essentially Google's free to select whoever they want and do so

09:57  5   that would be favorable for transfer.

09:57  6       In terms of judicial economy and other practical problems,

09:57  7   Google received our infringement contentions in August of 2020.

09:57  8   They have not provided any invalidity contentions.  If the case

09:57  9   is transferred, they'll have many more months to develop

09:57  10  invalidity defenses and noninfringement positions, and that's

09:57  11  prejudicial to Jenam.

09:57  12      And we've expended significant efforts to prepare this

09:57  13  case.  Initially, if you recall, Your Honor, we had over, I

09:57  14  think, around 400 claims.  We dropped that down to 65.  And

09:57  15  then we addressed all the deficiencies that Google identified.

09:58  16      Now, one other new development, Your Honor, I just want to

09:58  17  mention, there was a new patent that's related to the -- it's

09:58  18  in the same family as the patents in this lawsuit.  It issued,

09:58  19  and we did file another complaint.  So there's a second related

09:58  20  action that's going to have, I think, substantial overlap in

09:58  21  terms of the underlying technology and some of the claim terms,

09:58  22  for example.  And that is -- that'd be another reason to not

09:58  23  transfer the case.

09:58  24      That second case, Google has taken the position that the

09:58  25  relevant time period is the filing of the complaint.  And if

09:58  1  that's the case, the situation has changed, I think, somewhat

09:58  2  substantially since we filed this initial lawsuit last year,

09:58  3  and that includes the Midlothian data center.

09:59  4      I believe Ms. Olm said there's no data centers in Texas,

09:59  5  but information that we've found that's publicly available

09:59  6  indicates that it's at least partially operational.  And that's

09:59  7  another category of information that Google has refused to

09:59  8  provide, I think, necessary discovery on, so we understand what

09:59  9  its function is and what it's doing.  And that's in -- it's

09:59  10  within the subpoena power of the -- of the Court.

09:59  11      Now, some of the -- the other witnesses that Ms. Olm

09:59  12  identified, the third-party witnesses, you know, she cited

09:59  13  that, you know, the fact that they were authors on papers that

09:59  14  related to QUIC, but there were multiple, multiple authors.

09:59  15  And so just being listed on an article doesn't necessarily make

09:59  16  them the most knowledgeable or relevant witness in this matter.

10:00  17      So I think there's, you know, really, at a basic level, a

10:00  18  failure of -- of proof, you know, one, with the -- with the

10:00  19  location of documents, which I understand that you think

10:00  20  shouldn't be given too much weight, but also with identifying

10:00  21  the relevant third-party witnesses, identifying relevant party

10:00  22  witnesses.  It's challenging without having adequate discovery

10:00  23  for us to respond to that.

10:00  24      One second.  Trying to go through my notes just to address

10:00  25  some of the points that Ms. Olm made.

10:00   1     With regard to the inventor, Mr. Morris, Ms. Olm stated

10:00   2  that he was unwilling to -- to testify, but he stated in his

10:00   3  declaration that he was unwilling to testify during the COVID

10:00   4  pandemic.  I've spoken with him, and he is willing to testify

10:01   5  by the time there's a trial in the Western District of Texas.

10:01   6     THE COURT:  So your representation to the Court is that

10:01   7  the inventor would be willing to come to Waco in person?

10:01   8     MR. DAHLGREN:  Yes.  Yes.  Yes, Your Honor.  Yeah.  The --

10:01   9  the inventor is willing to -- to travel to Waco, and it's

10:01  10  substantially a shorter distance for him, particularly driving.

10:01  11     THE COURT:  Understood.

10:01  12     MR. DAHLGREN:  With respect to, you know, Court

10:01  13  congestion, Google, when they calculated the number of cases,

10:01  14  combined the MDL cases to essentially reduce the number.  But

10:01  15  when you don't do that, the number is actually about four -- I

10:01  16  think 4,000 cases higher than in the Western District of Texas.

10:02  17     And, Your Honor, your -- your process for handling cases,

10:02  18  you handle Markman, you know, sooner than a typical case in the

10:02  19  Northern District of California, fact discovery begins after

10:02  20  Markman, and we believe that that's a more efficient way to

10:02  21  adjudicate this case for the -- for the parties and for Your

10:02  22  Honor.

10:02  23     Now, with respect to local interest, again, Jenam is in a

10:02  24  bit of a conundrum because it is an Eastern District of Texas

10:02  25  entity, that's where it's located, but not being able to bring

10:02  1    suit there, you know, we're still, I guess, neighbors, if you

10:02  2    will, to the Western District of Texas.  And I think that

10:02  3    should be afforded some weight.

10:02  4        Mr. Gordon, the client, is, you know, very involved in the

10:02  5    community.  And also, Google's activities, I think, create a

10:02  6    substantial local interest in Austin and the Western District

10:03  7    of Texas as well.

10:03  8        And so if -- if -- so, well, taking a step back.  So

10:03  9    Google has not provided information beyond what's publicly

10:03  10   available that the activities occur in Austin, but publicly

10:03  11   available information indicates that there is engineering work

10:03  12   on a number of the accused products and that they also focus on

10:03  13   marketing and finance.

10:03  14       That latter part is -- is actually a big issue for us.

10:03  15   Google, so far, has only identified technical information and

10:03  16   technical people.  But with respect to damages and objective

10:03  17   indicia of nonobviousness, the financial people, the marketing

10:03  18   people would have relevant information.

10:03  19       Google cited in its -- its reply that there are far more

10:03  20   in the Northern District of California and cited to the Harrell

10:03  21   declaration.  But when you read the Harrell declaration, it

10:04  22   just simply doesn't say that.

10:04  23       And Austin, I believe, is one of the few Google offices

10:04  24   that has people that, you know, are dedicated to nonengineering

10:04  25   work, such as, you know, marketing and finance.  And again, our

10:04  1    position, that's relevant.

10:04  2        And we have asked for information sufficient to identify

10:04  3    people most knowledgeable about sales, marketing and financial

10:04  4    activities related to the accused products in the Western

10:04  5    District, and Google has so far refused to provide that.  So

10:04  6    that's another one of the discovery disputes.

10:04  7        And just going back to, you know, Google's local interest.

10:04  8    You know, they have been calling Texas homes for over a

10:04  9    decade -- well over a decade.  They have spent millions of

10:04  10   dollars leasing space and -- and building the Midlothian data

10:05  11   center.

10:05  12       And QUIC itself is not a -- a discrete product on its own.

10:05  13   It's important to understand that it's something that's used

10:05  14   across all of Google's products, as -- as far as we know.

10:05  15       And so all the activities that are occurring in the

10:05  16   Western District of Texas involve -- involve infringement.  And

10:05  17   so I -- again, I think that supports there being a local

10:05  18   interest in the Western District of Texas.  And at a minimum, I

10:05  19   believe that factor would be neutral.

10:05  20       Now, the last thing I just wanted to touch on, Ms. Olm

10:05  21   mentioned the IETF version of QUIC and then Google QUIC.  I'll

10:05  22   refer to the latter as G-QUIC.  But they have been working to

10:06  23   kind of come together.  When they first started off, they kind

10:06  24   of split and did things a little bit differently.  But now

10:06  25   they're working on, you know, compatibility issues.  And my

10:06  1    understanding is that they're going to implement fully the IETF

10:06  2    version of QUIC around the end of this year, or September, I

10:06  3    believe, was the last date that -- that I saw.

10:06  4        And so the idea that these, you know, IETF individuals,

10:06  5    like Dr. Iyengar, are necessary witnesses.  Again, I don't

10:06  6    think that's necessary to the case, given the current employees

10:06  7    at Google, the fact that they're adopting that standard and the

10:06  8    fact that they have been working at Google and on QUIC for

10:06  9    longer periods of time than the individuals that Ms. Olm

10:06  10   identified.

10:06  11       So, Your Honor, we believe that the, you know, conflict of

10:07  12   laws and -- and familiarity of the law factors are -- are

10:07  13   neutral, so we're not, you know, contesting that.  If you have

10:07  14   any questions on any specific factors, I'm happy to address

10:07  15   them.

10:07  16       THE COURT:  No.  I thought that was quite good.  If you

10:07  17   all will give me just a one-minute break, I need to check

10:07  18   something with my clerk and I'll be right back on board.  So

10:07  19   just give me a second.

10:07  20       (Pause in proceedings.)

10:08  21       THE COURT:  Let's -- just something hit me.  I just wanted

10:08  22   to take a break, but let me hear from plaintiff real -- for

10:08  23   just a second.  I'm more interested on this one question and

10:08  24   your answer probably than Google's.

10:08  25       You mentioned that there's a new complaint that's been

10:08   1   filed; is that right?

10:08   2        MR. DAHLGREN:  That's correct.

10:08   3        THE COURT:  Okay.  Is -- for purposes of any decision that

10:08   4   was made, would the plaintiff have an objection to combining

10:09   5   the patent in the current -- the case that just got filed with

10:09   6   the patents that are in these other cases, or does the

10:09   7   plaintiff see this as two distinct lawsuits that would require

10:09   8   different trials?

10:09   9        MR. DAHLGREN:  I think that given the fact that we have

10:09  10   been dealing with venue pretty much exclusively in the prior

10:09  11   litigation that both cases could be consolidated and -- and run

10:09  12   together.  I would say that the -- you know, the transfer

10:09  13   analysis for the -- the latter case would differ just based on

10:09  14   the timing.  But in terms of if it wasn't transferred, then

10:09  15   yes.  I think both cases could be on the same track and have

10:09  16   the same trial.

10:09  17        THE COURT:  With -- with the latter trial date?

10:09  18        MR. DAHLGREN:  With the -- yeah.  With the trial date that

10:09  19   would be set by the Court.  I apologize.  I don't recall if we

10:09  20   had set a schedule because of the ongoing venue stuff, but I

10:09  21   think that the new case could certainly go along with the --

10:10  22   the previous one.  And we could do --

10:10  23        THE COURT:  Well, let me make clear what I'm saying, is --

10:10  24   let's assume we -- forget the first case for a second, the one

10:10  25   we were discussing.  I'm just thinking about the one you just

10:10  1    filed.  Let's say that it was filed whenever and we're going to

10:10  2    set it roughly, again, rough numbers, 24 months after these --

10:10  3    the most recent case was filed by you all, would the plaintiff

10:10  4    have any objection to the schedule for the case that we're

10:10  5    discussing right now being delayed and taken up with -- and

10:10  6    getting the later trial date?

10:10  7        MR. DAHLGREN:  Your Honor, if that -- if that would be

10:10  8    your preference, I believe that that would be fine with us.  We

10:10  9    do think we could speed it up, but yes.  That would be fine

10:10  10   too.

10:10  11       THE COURT:  Okay.  So I'll be back, and then I'm --

10:10  12   Ms. Olm, I'm obviously going to give you a chance, just there's

10:11  13   something I want to ask my law clerk and clear it before and so

10:11  14   I'm ready for you.  But I'll be back in just a minute.

10:13  15       (Pause in proceedings.)

10:16  16       THE COURT:  Thank you for that break.  Ms. Olm, I'm happy

10:17  17   to go back on the record and hear your response.

10:17  18       MS. OLM:  Thank you, Your Honor.  I'd like to address just

10:17  19   a few points that opposing counsel made.

10:17  20       First, as to the third-party witnesses, Google has

10:17  21   provided a declaration from Dr. Iyengar stating that he's

10:17  22   likely unwilling to testify.  And although we haven't provided

10:17  23   declarations -- we -- we haven't reached out to the other

10:17  24   witnesses that we've identified, it's clear that it's going to

10:17  25   be more convenient for them to testify at home in Northern

26

10:17  1   California.  And there's no indication that they would be

10:18  2   willing to travel to Waco.

10:18  3       As to the companies that opposing counsel mentioned in his

10:18  4   response, Cisco, Fastly, Mozilla, all of these companies, Derek

10:18  5   points out that -- opposing counsel points out that these

10:18  6   companies work on the QUIC protocol, but it's not clear how

10:18  7   that has any relevance to this case.  They don't explain why

10:18  8   these companies would have relevant information.  And also, the

10:18  9   vast majority of these companies are headquartered in Northern

10:18  10  California.  So it's entirely unclear how this would -- how --

10:18  11  weigh in favor of keeping the case in Waco.

10:18  12      As to the two individuals that opposing counsel mentioned,

10:18  13  Yixin Wang, the former Google employee, he was at Google for

10:18  14  less than two years.  He left Google three years ago, and he

10:18  15  doesn't reside in the Western District of Texas.  And again,

10:18  16  Jenam provides no indication as to what relevant information he

10:18  17  has.

10:18  18      And then as to the other person they mentioned, Hajime

10:18  19  Fujita, that person is -- there's no evidence in the record at

10:19  20  all as to what information this person possesses, there's no

10:19  21  LinkedIn profile provided, no nothing.  The briefing doesn't

10:19  22  have any mention of what information he possesses or who this

10:19  23  individual is.

10:19  24      And on the other hand, the witnesses that we've

10:19  25  identified, they're directly relevant to articles that Jenam

10:19   1   cites in its infringement contentions and the Internet

10:19   2   Engineering Task Force.  And I think we've explained in detail

10:19   3   why they are relevant, and Jenam hasn't meaningfully contested

10:19   4   that.

10:19   5       As to why Dr. Iyengar, who's a co-editor of the IETF

10:19   6   specification would be relevant, I would point out that several

10:19   7   of the features that -- in QUIC that Jenam has accused in its

10:19   8   infringement contentions are optional in the IETF's version of

10:19   9   the QUIC protocol.

10:19  10       For example, the current draft of the IETF QUIC standard

10:19  11   states that the idle time-out feature is optional, and idle

10:19  12   time-out is one of the major features accused by Jenam in its

10:20  13   infringement contentions.  So this is example of a highly

10:20  14   relevant feature that's accused by Jenam and optional in the

10:20  15   standard.  And again, it's what's going to be -- we believe

10:20  16   Dr. Iyengar will have information relevant to damages and be

10:20  17   able to speak as to why the accused functionalities aren't

10:20  18   of -- aren't particularly important to the protocol.

10:20  19       So as to the willing witnesses, part of opposing counsel's

10:20  20   argument was that Jenam believes that Ian Swett will have

10:20  21   relevant testimony.  Ian Swett is a managerial technical lead

10:20  22   in Cambridge, Massachusetts, and there's evidence in the

10:20  23   record, in the Harrell declaration provided with our opening

10:20  24   brief, that states that Ian Swett would prefer to testify in

10:20  25   the Northern District of California than Waco.

10:20   1          It would be more convenient for him because the QUIC team

10:20   2   is -- part of it is located in Northern California.  He

10:20   3   frequently travels to San Francisco, again, where Google's

10:20   4   headquartered, whereas he doesn't have any reason to travel to

10:20   5   Texas.  And so he's -- again, we provided evidence that it

10:21   6   would be more convenient for him to testify there.  So it's

10:21   7   unclear why opposing counsel believes that his location in

10:21   8   Cambridge weighs in favor of keeping the case in Waco.

10:21   9          Similarly, the employee Alyssa Wilk, also.  Presumably it

10:21   10  would be more convenient for her to travel to the Northern

10:21   11  District of California.  Again, it's more common that these

10:21   12  Cambridge employees travel to San Francisco for work.

10:21   13         And Google has identified numerous recent employees in the

10:21   14  Northern District of California and has explained why these

10:21   15  information -- why these people have relevant testimony.

10:21   16  Again, one of the two technical leads is in Northern

10:21   17  California, and this person also works -- is the person who's

10:21   18  primarily responsible at Google for working with the IETF on

10:21   19  the standardized QUIC protocol, which opposing counsel admits

10:21   20  is relevant and he also manages, again, the website materials

10:21   21  that Jenam relies on heavily in its infringement contentions.

10:21   22         So it's -- it's -- he is going -- very likely going to be

10:22   23  a trial witness, and he's located in Northern California, as

10:22   24  are recent members of the QUIC team.  Again, at the operative

10:22   25  point in time, half of the QUIC team was in Northern

10:22  1   California, and those people still remain in Northern

10:22  2   California.

10:22  3        And although Jenam claims that we haven't provided

10:22  4   information about the roles that these various employees have,

10:22  5   we did offer to identify who the managerial leads are and who

10:22  6   the technical leads are, and we did so -- we did do so.  And we

10:22  7   also explained in our discovery responses, in detail, the

10:22  8   composition of the current QUIC team, and Jenam has never

10:22  9   really explained what other information it seeks.

10:22  10       And you can look at Google's discovery responses.  It's at

10:22  11  Docket No. 58-2, and you'll see the detailed information we

10:22  12  provide about the composition of Google's QUIC team.

10:22  13       There is no evidence that the majority of the work has

10:22  14  been done in Cambridge.  In Jenam's motion to compel briefing,

10:23  15  they pointed to some random Google employees in Massachusetts;

10:23  16  but as we explained in our -- in our motion to compel briefing,

10:23  17  there's no evidence that these people have worked on QUIC, and

10:23  18  we've attested to the fact that they haven't, the various

10:23  19  people that Jenam's identified.  And so that is just not the

10:23  20  case.

10:23  21       As to Mr. Morris, the inventor, there is no evidence in

10:23  22  the record that he's willing to testify in the Western District

10:23  23  of Texas.  His declaration states, "If required to testify as a

10:23  24  witness in this matter, it would be far more convenient for me

10:23  25  to testify using remote means of communication."

10:23   1       So again, there's no evidence in the record that Morris --

10:23   2   Mr. Morris would be willing to travel to either venue.  And so

10:23   3   his -- his location shouldn't be considered under the willing

10:23   4   witnesses factor.

10:23   5       As to the practical problems Jenam alluded to, Jenam did

10:23   6   not narrow its claims until December 2020.  And they've only

10:24   7   recently, in the past few months, provided revised infringement

10:24   8   contentions, and they have not addressed all the deficiencies

10:24   9   that Google has identified as they claim.  So we -- we do not

10:24   10  think that there's any prejudice there.

10:24   11      We'd also note that although we maybe had the infringement

10:24   12  contentions for a few months, Jenam had unlimited time to

10:24   13  develop the infringement contentions because they chose when

10:24   14  they filed this case.  So, again, I don't think it's

10:24   15  prejudicial that we've had some -- just a few months to work on

10:24   16  our invalidity contentions.

10:24   17      As to the new action with the single patent that's just a

10:24   18  trail off of the eight patents that are in this lawsuit, Jenam

10:24   19  filed that action before it filed its motion to transfer

10:24   20  opposition brief and its motion to transfer sur-reply, and it

10:24   21  never raised a concern that this new action would have an

10:24   22  impact on the practical problems factor.

10:24   23      So we agree that there's no prejudice, and we also agree

10:24   24  that, as you pointed out earlier, that there's a -- although I

10:24   25  would need to check with our client, Google would likely be

10:25  1   fine with consolidation as well and also the delayed brief --

10:25  2   the delayed schedule based on the second patent's filing date.

10:25  3        As to the local interest, Google's activities in Austin

10:25  4   are primarily around three areas:  One, recruiting; two, cloud

10:25  5   sales; and, three, engineering unrelated to the QUIC protocol.

10:25  6        Although there might be some work on -- Jenam claims that

10:25  7   there is financial and marketing and sales personnel in the

10:25  8   Western District of Texas.  But again, there -- we -- there's

10:25  9   only, as far as I'm aware, there's only maybe someone who works

10:25  10  on cloud sales.  But cloud is just one of the 81 accused

10:25  11  products in that -- in this case, and there's no evidence that

10:25  12  there's anybody in the Western District of Texas with any

10:25  13  specialized knowledge as to financial sales or marketing.

10:25  14       Google also works on cloud in its Northern District of

10:25  15  California offices.  And again, there's far more people in

10:26  16  Google's headquarters.  Over 60 percent of Google's workforce

10:26  17  is in the Northern -- is in Northern California, whereas less

10:26  18  than 2 percent are in Waco.  And there's just no evidence that

10:26  19  the Austin office will have any specialized knowledge as to any

10:26  20  of the accused products.

10:26  21       And as we've declared many times, there's no -- no persons

10:26  22  who work on QUIC or have specialized knowledge about QUIC

10:26  23  within the State of Texas.

10:26  24       If Your Honor has any other questions, I'm happy to

10:26  25  address them at this time.  I can --

10:26  1        THE COURT:  I don't.  Any response from plaintiff?

10:26  2        MR. DAHLGREN:  Yes, Your Honor.  And I apologize.  My

10:26  3   video has apparently gone out.  Can you -- can you hear me?

10:26  4        THE COURT:  I can.  I was wondering.  I was watching.  You

10:26  5   were talking, and I could hear you great, but your face was not

10:26  6   moving.  I -- I asked one of my law clerks.  That's -- I need

10:26  7   to get one of those screens for myself so I look, you know, I

10:26  8   look like I'm there and I keep talking but no one can see me.

10:26  9   That's a -- that would be a great improvement for everyone if

10:27  10  they didn't have to look at me, so...

10:27  11       But yes.  I can hear you just fine.  Thank you.

10:27  12       MR. DAHLGREN:  Okay.  Good.

10:27  13       You know, just a few things to point out.  You know,

10:27  14  again, this is a case where there's a lot of information

10:27  15  disparity.  Opposing counsel mentioned marketing people not

10:27  16  having specialized knowledge of QUIC, but it's not surprising

10:27  17  because QUIC is not a discrete product.  That does not mean

10:27  18  that they're not relevant with respect to the accused products

10:27  19  that utilize QUIC.

10:27  20       And again, all reasonable inferences should be drawn in

10:27  21  favor of the nonmovant, and that would help address this

10:27  22  information disparity.

10:27  23       Now, there are a couple of other just -- I want to say

10:27  24  failure of -- failure of proof.  To have -- for the compulsory

10:27  25  process for unwilling witnesses, you have to demonstrate that

10:27   1   they're unwilling.  And Google at -- you know, at best,

10:27   2   indicated Dr. Iyengar was unlikely to -- to testify, and that's

10:28   3   speculative.

10:28   4         Now, again, I understand your position on the -- the

10:28   5   documents.  But again, Google never identified the location of

10:28   6   those documents, and they never provided any nontechnical

10:28   7   documents either or even identified where those nontechnical

10:28   8   documents would be.

10:28   9         Now, for the convenience of the witnesses, I understand

10:28   10   that Mr. Swett stated a preference for going to San Francisco,

10:28   11   but all these witnesses could testify remotely, is one option.

10:28   12   I know courts have become more receptive to that.

10:28   13         And also, there's ample office space in Austin that Google

10:28   14   has where they could, you know, work during their free time and

10:28   15   not have -- not waste -- not waste a bunch of time, not have it

10:28   16   be such a burden on them.

10:28   17         And just a few more points, Your Honor, I want to address

10:29   18   about, you know, Mr. Morris the inventor.  He said he was

10:29   19   unwilling to testify, you know, in person in either forum

10:29   20   during the -- the COVID pandemic.  It's not just he's

10:29   21   unwilling, period.  And hopefully now with the vaccines and

10:29   22   it's winding down, that won't be an issue.

10:29   23         And he has agreed in the interim for, you know,

10:29   24   depositions, to do so remotely, which has been -- every depo

10:29   25   I've taken so far during COVID has been remotely.

34

10:29  1      Now, with the infringement contentions, you know, our

10:29  2  understanding was we addressed all the deficiencies.  We've

10:29  3  never heard from Google what additional deficiencies exist, but

10:29  4  we were interested in, you know, moving the case forward and

10:30  5  clarifying the accused products.

10:30  6      And again, there's just a complete absence of any sales

10:30  7  and financial people or information, which, again, would be

10:30  8  relevant to damages and objective indicia of nonobviousness,

10:30  9  you know, among other issues.

10:30  10      And again, when -- I guess Ms. Olm stated that the Austin

10:30  11  office, there's no indication that it was having any

10:30  12  specialized functions.  The public information, when they

10:30  13  released a press release about opening the -- their offices

10:30  14  there, they said that was going to be one of the few that would

10:30  15  be dedicated to, you know, marketing and finance in part and

10:30  16  also work on things like cloud, Android$^{\text{TM}}$, Google Play and a

10:30  17  number of other accused products.

10:30  18      And so I do think that there are, you know, substantial

10:30  19  ties between this -- this action and the activities that are

10:31  20  going on in this district by Google.

10:31  21      And to the extent that there are employees out in the

10:31  22  Northern District of California, again, we would, you know,

10:31  23  probably do a remote deposition, go to them, and they could

10:31  24  participate remotely, potentially, if there was a concern about

10:31  25  traveling still.

10:31   1    And I guess -- just so I'll -- I'll just end it, again, by

10:31   2   saying that I think Google just has not provided enough --

10:31   3   enough evidence to demonstrate that the Northern District of

10:31   4   California is clearly more convenient.  We have, you know,

10:31   5   multiple people close to your court.  And it would be, I think,

10:31   6   very burdensome for them to have to go to the Northern District

10:31   7   of California.  They don't have the -- quite the means that --

10:31   8   that Google has.

10:31   9    So when Google says things are burdensome, I kind of take

10:32   10   that with a grain of salt.  And I don't mean that in a negative

10:32   11   way, but just, you know, with their resources, I think that

10:32   12   they would be better equipped to come to your courthouse, Your

10:32   13   Honor, than vice versa.  And -- and merely shifting the

10:32   14   inconvenience from one party to another is -- is -- that's --

10:32   15   that's not a basis for granting a transfer.

10:32   16    So unless you have any questions, I will -- oh, Your

10:32   17   Honor, I was -- I was very remiss in the beginning.  I wanted

10:32   18   to introduce two people who are attending.

10:32   19    THE COURT:  Okay.

10:32   20    MR. DAHLGREN:  Our client, Mr. Andrew Gordon, is

10:32   21   attending.  And also the inventor, Mr. Paul Morris, is also

10:32   22   attending.

10:32   23    THE COURT:  Well, I want to take the time to thank them

10:32   24   for attending.  I don't remember Mr. Jones telling me whether

10:32   25   or not folks from Google were on.  But if they are attending, I

10:32  1   certainly appreciate their being here as well, probably --

10:32  2   because it's earlier out where they are than where I am.

10:32  3        So I always very much appreciate it when in-house counsel

10:33  4   or clients themselves actually take the time to attend and see

10:33  5   how -- I'll go ahead and tell you that one of my favorite

10:33  6   quotes, not exact quotes, but I listen to the Supreme Court

10:33  7   arguments.  Mr. Jones has heard me tell this story, I think.

10:33  8        During one of the arguments that was made, Justice Breyer,

10:33  9   at the end of a hearing just like this said, the problem we

10:33  10  have is that I listen to one side and I think they're right,

10:33  11  and then I listen to the other side and I think they're right.

10:33  12  And he said to one of the lawyers, what am I to do?

10:33  13       That was probably rhetorical.  But these were both very

10:33  14  good arguments, which you might think having not good arguments

10:33  15  would make it -- the job easier.  Having really good arguments

10:33  16  makes it tougher.  But we will -- we'll certainly get to work

10:33  17  on this.

10:33  18       Is there anything else we need to take up with regard to

10:33  19  the motion or anything else in the case?

10:33  20       I'll start with counsel for plaintiff.

10:34  21       MR. DAHLGREN:  Your Honor, we did file a motion to compel.

10:34  22       THE COURT:  Okay.

10:34  23       MR. DAHLGREN:  If you want to address that, I'm prepared

10:34  24  to do so.  If you want to defer that for now, that's -- that's

10:34  25  fine too.  I just ask that if -- if the Court's inclined not

10:34  1    to -- or to -- to grant the transfer, we would appreciate the

10:34  2    opportunity to at least present an argument as to why we need

10:34  3    that additional information and how it could be dispositive

10:34  4    and -- and show that the Western District of Texas is the

10:34  5    proper forum.

10:34  6         THE COURT:  I'll make that deal, which doesn't -- which

10:34  7    shouldn't indicate that I've decided one way or the other.  But

10:34  8    certainly I'll get with my law clerk and we'll look at the

10:34  9    motion to compel and determine whether or not we think the

10:34 10    information that might be obtained in the motion to compel is

10:34 11    such that it would have an impact on us.  And if we think that

10:34 12    it would and we need to have you all tell us either why you

10:34 13    shouldn't have the information or why you're not entitled to

10:34 14    it, we'll get another hearing set pretty quickly.

10:34 15         Other than that, for the plaintiff, is there anything else

10:35 16    we need to take up?

10:35 17         MR. DAHLGREN:  No, Your Honor.  And I appreciate the --

10:35 18    the opportunity to argue in front of you again.  It's always a

10:35 19    pleasure.

10:35 20         THE COURT:  Always a pleasure.

10:35 21         Ms. Olm, I think this is the first time I've had you

10:35 22    appear in front of me.  I could be wrong.  But I think you did

10:35 23    an outstanding job for someone who, I think, it appears to me,

10:35 24    looks to be relatively new to the bar.  But everyone on this

10:35 25    call appears to be much younger than me, so I'm always hesitant

38

10:35  1    to say that.

10:35  2        Is there anything else we can take up on behalf of Google?

10:35  3        MS. OLM:  No, Your Honor.  Nothing else from us.  Thank

10:35  4    you, though.  It was -- it was great to have this opportunity

10:35  5    to argue before you.

10:35  6        THE COURT:  I look forward to hopefully seeing you in

10:35  7    person in trial or something that we do here in Waco or Austin.

10:35  8    Have a good day, everyone.  And we'll get to work on this.

10:35  9    Thank you.

10:35  10       (Hearing adjourned at 10:35 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   UNITED STATES DISTRICT COURT )

2   WESTERN DISTRICT OF TEXAS     )

3

4        I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of Texas, do

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8        I certify that the transcript fees and format comply with

9   those prescribed by the Court and Judicial Conference of the

10  United States.

11       Certified to by me this 6th day of May 2021.

12
                              /s/ Kristie M. Davis
13                            KRISTIE M. DAVIS
                              Official Court Reporter
14                            800 Franklin Avenue
                              Waco, Texas 76701
15                            (254) 340-6114
                              kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25
```